BRYAN E. McCORMICK, A MINOR, BY HIS NEXT FRIEND, J. G. McCORMICK, RESPONDENT, v. LOWE AND CAMPBELL ATHLETIC GOODS COMPANY, A CORPORATION, APPELLANT.—144 S. W. (2d) 866.

Kansas City Court of Appeals. September 16, 1940.

*Leslie A. Welch, Clyde J. Linde* and *Richard H. Beeson* for respondent.

*John B. Gage, Paul Ware* and *James A. Moore* for appellant.

*Gage, Hillix, Hodges & Cowherd* of counsel.

618

620

CAMPBELL, C.—The defendant, Lowe & Campbell Athletic Goods Company, furnished a vaulting pole which broke while plaintiff was using it in vaulting, and thus caused him to fall and be injured. He brought this suit to recover for his injuries, had a verdict and judgment in the amount of $7500. The defendant has appealed.

The defendant argues the court erred in refusing its request for directed verdict. In ruling this question we must accept as true the evidence favorable to plaintiff and reject as untrue the evidence for the defendant, unless that evidence tends to aid the plaintiff's case.

The facts are: Plaintiff, in March and April, 1937, was a high school student in the Deuel County High School at Chappell, Nebraska. He was a skilled high school pole vaulter. The defendant at that time and continuously for a long time prior thereto, was engaged in manufacturing and selling various kinds of athletic goods, among which were vaulting poles. The Deuel County High School, on March

4, 1937, sent to the defendant an order as follows: "1-T14—vaulting pole (hand picked) vaulter only weighs 120 lb."

This order was made from defendant's catalogue, reading in part as follows:

## "TRACK AND FIELD

"No Guarantee on Vaulting Poles or Javelins.

"Bamboo vaulting poles being a product of nature and subjected to various kinds of treatment cannot be guaranteed against splitting or breaking. Keep in a cool, dry place laid flat on a level floor. Avoid Heated basements and sudden change of temperature. . . .

### " 'EXTRA SELECT' BAMBOO VAULTING POLES

"We import our bamboo poles direct from Japan in large quantities and are thus assured of the best selection in all lengths. Special tape of extra strength is used in wrapping and they are wood plugged. The 'select' poles are 'Red-Head' marked.

"No. T10-10-foot Bamboo Pole, wrapped and plugged .. $4.00 $2.75

"No. T14-14-foot Bamboo Pole, wrapped and plugged .. $7.00 $4.90
"No. T16-16-foot Bamboo Pole, wrapped and plugged .. $7.75 $5.45

"After sorting out the 'extra select' poles there are many left that are perfectly usable and thoroughly satisfactory for the average high school vaulter. These are good, strong, serviceable poles. . . .

"No. T6J-8-foot Bamboo Pole, without tape or plug .... $ .60 $ .40"

The defendant, acting on that order, sent to the school a bamboo vaulting pole which was too short, crooked, and not properly balanced. In a few days thereafter the school's athletic coach, Miller, advised defendant's traveling salesman, Hal Bowers, of the condition of the pole, and Bowers promised to make an adjustment on account of the defect, and to supply another pole. The promise was kept and the second pole was delivered by the defendant to the school on April 22. Plaintiff on the day the pole arrived took it to the athletic field, vaulted twice with it, and each time his handhold was about eight feet, two inches from the lower end of the pole. He then made a third vault in the usual manner, and while his body was crossing the cross bar the pole "just snapped off;" "just cracked off," in consequence of which plaintiff fell and was seriously injured. The break was underneath the tape which defendant had put on the pole.

The superintendent of the High School, for the plaintiff, testified he saw the second pole when it was delivered at the school, but could not remember whether or not he "lifted it."

George Miller, an experienced pole vaulter and coach of athletics and science teacher of the school, testified that the pole which was ordered on March 4 was not satisfactory, was poorly balanced and

not straight; that he informed Bowers of the condition of the pole, and that he thought plaintiff had a chance to break the state record in vaulting; that they wanted to get a 16-foot pole, "straight pole and better balanced pole," and that Bowers said he would "order it himself;" that he received the second pole, took it in his hands "to determine how much spring and elacticity it had, put some weight on it, it seemed to have quite a bit of elasticity. Then I turned it over to" plaintiff. This witness was not present at the time of the accident. However, he examined the pole, evidently in a few minutes thereafter, and found the pole did not bend or buckle; that it was "broken clear in two and that the break was almost smooth," no splitting or splintering.

In the cross-examination of the witness he testified that he saw nothing indicating the pole was dangerous.

"Q. And you thought it (pole) was all right? A. I had never gotten a pole that I was able to break before; there was no reason why I should suspicion it being a defective pole."

Mr. Miller further testified that he recalled seeing two instances in which a vaulter broke a bamboo pole; that in those instances the pole "did not break clear in two, the vaulter hanging on to the pole with one hand had pushed away from the vaulting pole and on top of that he supports his arms and head so that the feet come down first;" that the poles buckled, "they never break entirely in two," and that the pole here involved was the only pole which broke "completely."

Plaintiff's witness, G. Harry Clay, testified he had had experience in testing materials for strength and defects, was a graduate of Rose Polytechnic Institute with the degree of B. S.; that he took an engineering course in an engineering school, was a member of the American Chemical Society, and that he was local counselor of that society, had been a member of American Society for Testing Materials; that for ten years he was connected with the Kansas City Testing Laboratory which specialized in the testing of engineering materials, construction materials, road materials, "and all that sort of thing;" that bamboo is used as a structural material in the Orient and in South America; that he had made a study of bamboo by searching literature and experimenting on his own account; that the literature he had read was the Encyclopedia Brittanica, the year books and bulletins of the Agricultural Department of the United States; that from his study and experiments he was familiar with the physical characteristics and properties of bamboo poles; that the principles of testing bamboo were the same as the principles used in testing other structural materials. He further testified he examined the pole, the breaking of which caused plaintiff to be injured, and found a defect therein; that his conclusion there was a defect was based on his examination of the break itself; "it (pole) was broken

short off just as a piece of brittle oak breaks off," "from the fact that bamboo breaks in an entirely different way;" and that bamboo breaks by long splits and cracks from the distortion of the cross section.

"Q. Now, if a bamboo pole is not defective, tell the jury how the pole will break or buckle or bend if it is subjected to more stress and strain than it can stand? A. Well, I can probably illustrate that with a fishing pole or with any of these pieces if I had the strength, but it breaks first by being distorted. As the pole is bent that circle becomes an ellipse. That flattening of the section of the pole results in cracking, probably through one or two of the knobs. That weakens the whole pole and it breaks, but not in two. It will bend clear double before it will break in two.

"Q. That is when it is not defective. A. That is when it is not defective."

Plaintiff testified he had been pole vaulting for ten years prior to the accident; that during that time he had not seen or heard of a pole breaking during a vault, but had heard of one splitting; that he took the pole in question from the school building to the athletic field and vaulted twice "successfully;" that at each of said times his hold was eight feet, two inches from the butt of the pole; that he then placed his hold eleven feet, three inches from the butt of the pole, and proceeded to vault in the usual manner and that in the vault the pole broke "completely apart."

The defendant's witness, Charles Regelbrugge, testified he had been in charge of the vaulting pole department of the defendant for eight years; that defendant each year obtains 4000 to 6000 bamboo poles "in the raw" which were harvested in Japan; that the poles when received were each 18 to 20 feet in length and that fifteen to fifty per cent of them were defective; that the defective ones could in some instances be discovered by "merely looking" at them, other defective poles could be discovered only by testing them; that when the defendant received an order for a vaulting pole it sent to him a work ticket on which was stated the length and type of pole ordered and in some instances the weight of the person who would use the pole in vaulting; that in filling the order he selected a pole, cut it to the length stated on the work ticket, then tested it by throwing his weight upon it "in four different positions;" he then caused a maple-wood plug to be inserted in the butt of the pole; the pole was then painted and wrapped in numerous places with adhesive tape. In his cross-examination this witness said he had no recollection of testing any pole that was sent to Chappell, Nebraska.

"Q. Wait until I finish my question—did you get any work orders or message from your superiors in April, 1937, to send another pole out to Chappell, Nebraska, because the first one that you had sent out there was crooked? A. I don't remember.

"Q. Well, if you had received word from headquarters that you had sent out a crooked pole, you would remember that, wouldn't you. A. No, sir.

"Q. Do you send out crooked poles? A. Sometimes, when they ask for a second.

"Q. But if they ask for an extra select first grade, do you send out a crooked pole? A. No, sir.

"Q. You test them to see that they are straight, don't you? A. Yes, sir.

"Q. And if it is crooked, you don't send it out as a first extra pole do you? A. No, sir."

He further testified he heard of the accident "shortly" after it happened.

"Q. And if you did send out a crooked pole in response to this first order, out to Chappell, Nebraska, you don't know how that got by your test, is that it? A. No, sir."

He further testified he tested a pole for the purpose of making sure it would hold the person for whom it was intended and for the purpose of discovering defects.

"Q. And would the test that you customarily made before you sent these poles out to customers disclose defects? A. Yes, sir, we could sure find that."

Further pertinent facts will be referred to in ruling the questions involved in this appeal.

In contending the plaintiff failed to make a submissible case, the defendant says it gave notice to the Deuel County High School that "bamboo vaulting poles will break and split." Defendant's catalogue said it did not guarantee bamboo poles against splitting or breaking; that it bought bamboo poles in large quantities and was thus assured of the best selection; that special tape of extra strength was used in wrapping the poles. These statements cannot be construed as notice to either the school or plaintiff that the pole was or might be a defective one. On the contrary, the statements are sufficient to induce belief in the mind of a reasonably prudent person that defendant had made the "best selection" and had exercised due care in preparing the pole for the use for which it was intended. However, apart from the statements in the catalogue, we conclude the evidence of Regelbrugge shows that it was the practice and custom of defendant to inspect and test each bamboo vaulting pole before sending it to the purchaser. In other words, defendant recognized it was under duty to inspect and test a vaulting pole before releasing it to be used in vaulting. The purpose of such test, as explained by Regelbrugge, was to "make sure" the pole would hold the weight stated in the work ticket (in the instant case 120 pounds) to discover defects; and that such testing as defendant customarily made would "sure" disclose any existing defect. It follows, of course, if the pole were defective,

and that a reasonably careful test would have disclosed the defect, then the jury could find defendant failed to make such test.

The defendant argues that the pole was a product of nature; that it was a seller, not the manufacturer of the pole. The bamboo, when received by defendant, was a product of nature. When defendant, by the several acts hereinbefore stated, made the product of nature into a vaulting pole, it manufactured the pole. [H. Kohisaat & Co. v. O'Connell, 90 N. E. 689, 255 Ill. 271.]

From an examination of the numerous cases cited in the briefs relating to the so-called modern rule governing liability of a manufacture in cases such as the present one, we conclude that a manufacture of a product is under duty to exercise ordinary care to test the product to determine whether or not it has a defect which would render it unsafe when applied to its intended use; that a failure to perform such duty renders the manufacture liable to a person injured in consequence of such failure while using such article in the ordinary and usual manner. [McLeod v. Linde Air Prod. Co., 1 S. W. (2d) 122, 318 Mo. 397; Jacobs v. Frank Adams Electric Co., 97 S. W. (2d) 849; White v. General Chemical Co., 136 S. W. (2d) 345; McPherson v. Buick Motor Car Co., 111 N. E. 1050, 217 N. Y. 382; Heckel v. Ford Motor Co., 39 L. R. A. 989; Tegler v. Farmers Union Gas & Oil Co., 246 N. W. 721, 124 Neb. 336.]

Defendant at the time it sent the second pole to the school knew plaintiff intended to use that pole in vaulting. It was therefore its duty to exercise reasonable care in testing the pole to ascertain whether or not it was free of defects which would endanger plaintiff when he put the pole to the intended use.

The defendant insists there was no evidence showing that the pole was defective; that its evidence "demonstrates" the pole was inspected and tested. Neither of these contentions can be sustained. There was evidence to the effect the pole "snapped off." This was sufficient, when taken in connection with the evidence of Clay, to enable the jury to find the pole was brittle. The only evidence which it can be said tended to show the pole which broke was tested, was that of Regelbrugge who stated the manner in which he customarily tested bamboo vaulting poles. He had no recollection of preparing the crooked and unsuitable pole under the order of March 4 calling for an "extra select" pole; no recollection of preparing the second pole which was sent to the school. He was the only witness who knew whether the pole was or was not tested, and his evidence on that subject was not sufficient to conclusively show he tested the pole in question. The jury could very well find that if he had thrown his weight upon the pole in four different positions as he stated he customarily did, the pole would have "snapped off" because it was brittle. Regelbrugge further testified that in "some years" he broke one-half of the poles in testing them; that he tested the poles to make sure "they would hold the man they were ordered for."

"Q. If that man was a 150-pound man, you wouldn't give it any more of a test, would you? A. No, sir.

"Q. And if he was a 200-pound man you wouldn't give it any more of a test, would you? A. No, sir. . . .

"Q. And you would give it the same kind of a test without regard to what size person it was being ordered for? A. Yes, sir."

Plainly, the court cannot say such a method of testing was a reasonably careful method. The question was one for the trier of the fact.

Defendant, in contending no case was made for the jury says that, plaintiff failed to prove any act or omission on its part was the proximate cause of his injuries; that plaintiff was guilty of contributory negligence "and had assumed the risk incident" to engaging in pole vaulting.

The facts stated above were sufficient to warrant the jury in finding the pole was defective and unsafe for its intended use; that if defendant had tested it in a reasonably careful manner the defect would have been discovered and the injury averted. Thus the failure of the defendant to properly test the pole was the direct cause of the accident.

Plaintiff assumed the ordinary risk of pole vaulting but he did not assume risks due to the negligence of the defendant. He did not, prior to the accident, know or have cause to believe the pole was not a safe one to use in vaulting. He vaulted three times in the usual and skillful manner. This was not negligence as a matter of law. In this connection it must be remembered Miller, an experienced pole vaulter, testified he had never had a pole which he could break, and that he had no cause to "suspicion" the pole in question was a defective pole. It may be the defendant's opinion evidence was sufficient to allow the jury to find plaintiff was guilty of contributory negligence, but the court could not tell the jury it must believe that evidence.

Considering the evidence in a light most favorable to plaintiff, we hold the request for directed verdict was well ruled.

Defendant offered in evidence three photographs of the vaulting box used by plaintiff at the time of accident. The photographs were, on plaintiff's objection, excluded from the evidence. At the time plaintiff was injured the vaulting box was buried level with the ground. About May 15 the box was taken from the ground and placed near the school house where it remained exposed to the elements until the photographs were taken on August 31. As shown in one of the photographs there was a crack in the bottom of the vaulting box which, according to defendant's opinion evidence, rendered it unsafe for use. The only evidence touching the condition of the vaulting box on April 22 was to the effect it was in good condition; and that there was no crack in it which "would have caused any difficulty

in making a successful pole vault.'' Nor was there evidence showing the photographs were correct representation of the vaulting box. In such circumstances we cannot convict the trial court of error in excluding the photographs. [Baustain v. Young, 142 Mo. 317; Lynch v. Missouri, Kansas & Texas Ry. Co., 61 S. W. (2d) 918, 333 Mo. 89; Home Insurance Company of New York v. Savage, 231 Mo. App. 569.]

Defendant objected to the opinion evidence of the witness Clay on the ground he was not qualified to testify as an expert. Defendant does not call attention to any particular evidence to which objection was made but says its ''criticism is leveled at the whole of'' his testimony. Clay's testimony shows he was qualified both by learning and experience to say what was the proper method of testing the strength of all kinds of structural materials. The evidence of defendant's witness Hawthorn shows that bamboo is a structural material; that the fundamental principles ''applicable for the testing of one type of structural material, such as ash or pine, are the same as the principles applicable for the testing of any other structural material.'' Clay testified to facts showing the pole was brittle. If the pole were brittle it was undoubtedly an unsafe pole to use in vaulting. It was not error to receive his evidence. [Combs v. Rountree Const. Co., 205 Mo. 367, 104 S. W. 77; Vitale v. Duerbeck, 338 Mo. 556, 92 S. W. (2d) 691; Ambruster v. Levitt Realty & Investment Co., 107 S. W. (2d) 74.]

Defendant criticizes plaintiff's Instruction No. 1 for the reason it allowed plaintiff to have the verdict without requiring the jury to find that defendant failed to give notice to the school ''of the characteristics, limitations or defects of bamboo poles, or that defendant's vendee did not know the characteristics, limitations or defects of bamboo poles when used for vaulting. The instruction totally ignored the evidence that defendant gave notice that bamboo poles are liable to break and split. It totally ignores the evidence that plaintiff and defendant's vendee knew that bamboo poles are liable to break and split.'' The rule invoked by defendant would apply if it had notified its vendee or plaintiff (it knew plaintiff would use the pole) that it had not made a reasonbly careful test or that the pole was defective, but there was no notice the pole was defective or that defendant had failed to properly test it. The statements in the catalogue to the effect that defendant did not guarantee the pole against splitting or breaking did not relieve it from the consequence of its negligence.

The pole ordered was an extra select pole; the catalogue said that ''after sorting out'' that type of poles ''there are many left that are perfectly usable and thoroughly satisfactory for the average high school vaulter. These are good strong, serviceable poles. . . .''

If the ''seconds'' are good strong, serviceable poles, then it cannot be said the general statement that defendant would not guarantee poles against breaking or splitting was notice that the ''extra select''

was or might be defective. Under the evidence the defendant could not have known that any pole of the thousand bought by it each year was a strong, serviceable pole unless it applied a proper test. There was no evidence the defendant gave notice the pole was liable to break because of a defect therein. Advertising that bamboo would break or split did not impart information not possessed by the vendee or plaintiff for the reason they knew that a bamboo pole or, for that matter, any type of pole will break or split when subjected to a strain greater than its strength would sustain. If the defendant had stated in its catalogue that it did not test bamboo poles or that such poles were or might be defective, the rule invoked would govern the rights of the parties. The instruction is not open to the criticism made of it.

The instruction is further criticized on the ground it is "unintelligible and misleading and so defective in form as to furnish no guide to the jury."

The instruction covers almost three pages of the record, and as the defendant does not call attention to any clause or sentence which it claims is misleading or unintelligible, we will not consider the charge.

Defendant requested the following instructions, which were refused.

"U.

"The Court instructs the jury that if you find and believe from the evidence that either the Superintendent of Deuel County High School, which the plaintiff attended, or the Coach of the athletics employed by said high school knew at and prior to the time plaintiff was injured, as shown in the evidence, that bamboo poles, purchased from the defendant, Lowe & Campbell Athletic Goods Company, were liable to break or split while in use as vaulting poles, then your verdict must be for the defendants.

"W.

"The Court instructs the jury that if you find and believe from the evidence that the plaintiff knew upon and prior to the 22nd day of April, 1937, that bamboo poles as sold by the defendant, Lowe & Campbell Athletic Goods Company, were liable to break or split when used for vaulting, and also knew the aluminum pole owned by the Deuel County High School was a pole of more durable construction and less likely to break when so used and that plaintiff voluntarily chose to use the bamboo pole purchased by said high school from said defendant, in vaulting and was injured while so doing as a result of the breaking of such pole, then your verdict must be for the defendants.

"Z.

"The Court instructs the jury that if you find and believe from the evidence that the possibility of injury from the splitting or breaking of a bamboo pole, when used in the sport of vaulting, was known

to plaintiff on or before April 22, 1937, then, if you so find, the possibility of such injury was a risk assumed by the plaintiff and in that event your verdict must be for the defendants.

"G-1.

"The Court instructs the jury that if you find from the evidence that the defendant, Lowe & Campbell Athletic Goods Company, did give reasonable notice to the Deuel County High School and its officials charged with purchasing bamboo vaulting poles, then there is no duty owing to the plaintiff and you should find for the defendant.

"H-1.

"The Court instructs the jury that if you find and believe from the evidence that the defendant, Lowe & Campbell Athletic Goods Company, in the sale of bamboo poles for use as vaulting poles, gave notice to the Deuel County High School or the officers or employees thereof who were authorized to or did purchase such poles of limitations, restrictions or defects therein, then such defendant is not liable to the plaintiff in this case for any injuries received by him in connection with the use of such poles for vaulting and your verdict shall be for the defendant.

"J-1.

"The Court instructs the jury that if you find and believe from the evidence that the defendant, Lowe & Campbell Athletic Goods Company, by statement printed in its catalog, shown in evidence, used reasonable care to advise the officials of the Deuel County High School that the bamboo poles offered by it for sale were liable to break and split, then your verdict in this case must be for the defendants."

Each of these instructions authorized a verdict for the defendant even though the defendant was negligent as charged. Neither plaintiff nor the school had cause to suspect the pole was brittle and defective; it was an "extra select," wrapped with special tape of extra strength; even the "seconds" were strong and serviceable, according to the statements of defendant. In such circumstances both plaintiff and the school had right to believe the pole was fit to use in vaulting. The action of the court in refusing the instruction was proper.

Plaintiff, by his next friend, both of whom were citizens of Nebraska, brought this suit against the instant defendant corporation, a citizen of Delaware, Charles Regelbrugge, a citizen of Kansas, Leslie R. Freeburg, Arno F. Heinrich and Samuel G. Pike, citizens of Missouri. The petition of the corporate defendant for removal of the cause to the Fedeal Court was sustained. Thereafter said Federal Court remanded the cause to the Circuit Court of Jackson County, Missouri. Trial of the action was begun on December 5, 1938. The plaintiff rested his case on December 8. The defendants Freeburg, Heinrich and Pike separately requested verdict be directed for them. The

requests were marked "given" and thereupon plaintiff took an involuntary nonsuit as to each of said defendants with leave to move to set the same aside. When the nonsuit was taken counsel for the corporate defendant and Regelbrugge requested the court for time in which to prepare petition and bond for removal, which request was denied. The corporate defendant and Regelbrugge then separately requested a peremptory instruction. The requests were refused and the court told defendants to proceed with their defense. No objection was made or exception saved to the action of the court in directing the defendants to proceed with the trial. The trial progressed and at the close of the evidence on December 10 the plaintiff voluntarily dismissed as to the defendant Regelbrugge. The defendant, remaining in the case, again requested time in which to prepare petition and bond for removal to the Federal Court. The request was denied.

It is the defendant's theory the plaintiff did not oppose the giving of the peremptory instructions for the resident defendants, acquiesced in the ruling, and as he saved no exception to the ruling the nonsuit was voluntary and the cause was then removable. The claim that plaintiff did not oppose the giving of the peremptory instructions is based upon the fact that when said instructions were presented his counsel said he did not care to argue the demurrers. The statement of counsel cannot be construed as acquiescing in the ruling thereafter made. When counsel took an involuntary nonsuit with leave to set the same aside, he told the court and his adversary that he was not acquiescing in the ruling. True, he did not have the court reporter note exception. He could not at that time have saved exception for the reason an exception can be saved only in a bill of exceptions. For an exception to be availing the alleged error must be called to the attention of the trial court in a motion for new trial.

It may be it was the practice to consider exceptions saved to all adverse rulings and to have the exception shown in a bill of exceptions. Be this as it may, the request for time did not divest the court of jurisdiction. If the case were removable and a proper petition and bond had been presented, then the court could not have proceeded further. The refusal of the request is presented upon the theory such ruling was erroneous and not upon the theory the court did not have power to make the ruling. We are not merely considering whether the case was or was not removable. We are considering whether the court committed reversible error in refusing defendant's request for time in which to prepare petition and bond for removal. Even though the case was removable, and we do not think it was, the court did not abuse its discretion in denying the request.

When the defendant Regelbrugge was dismissed from the case the corporate defendant again requested time in which to prepare petition and bond for removal. The request was denied. As Regelbrugge was a citizen of Kansas the dismissal as to him did not affect

the removability of the cause. The second request was no more effective than the first.

There is no claim the verdict was excessive.

The record is free of error prejudicial to the defendant. The judgment should be and it is affirmed. *Sperry, C.,* concurs.

PER CURIAM:—The foregoing opinion of CAMPBELL, C., is adopted as the opinion of the court. The judgment is affirmed. *Shain, P. J.,* and *Bland, J.,* concur; *Cave, J.,* not sitting.

ON MOTION FOR REHEARING.

CAMPBELL, C.—The defendant in motion for rehearing (par. 3) calls attention to the facts its witness Regelbrugge testified he had no data on any pole nor the name or address of the purchaser; that he had no independent recollection of the shipment of a pole on any particular day, that he was present on each working day during March and April, 1937, and filled all orders for poles sent out during that period. The defendant then contends that if that evidence is disregarded "plaintiff's own evidence dissipates any inference which might otherwise be favorable to him." The respondent offered in evidence the deposition of Regelbrugge who was the man who inspected and tested poles for appellant. The following are excerpts from such testimony.

"Q. And is that test you give the poles that are carried over? A. Yes, all of them, carried over or new stock. We have to do it on every one of them.

"Q. Do you remember of shipping a pole to the Board of Regents of Deuel County High School? A. No, I don't.

"Q. Do you have any independent recollection of any one particular pole which you may have shipped at any time? A. No, I don't. You see, I don't know where they ship them to when I fix them up. All I get is the number on my card, it don't have any name or anything on it, so I don't know where they are going.

"Q. You have no recollection of the particular pole involved in this case. A. No.

"Q. You have no way of remembering what you did with respect to any particular pole in March or April, of 1937? A. No, sir.

"Respondent offered no other evidence on this subject. . . .

"In his opinion the commissioner had ignored such evidence and reached the conclusion by applying improper principles of law."

The plaintiff introduced the deposition of Regelbrugge. When the deposition was offered counsel for the parties agreed, and the court instructed the jury, it should be considered as against the deponent only and not against any other defendant. Later the deponent was dismissed from the case. When the dismissal was

entered the deposition passed out of the case and could not there-after be considered by court or jury.

It is true, as charged in the motion, the opinion "ignored" that evidence and it is equally true that evidence was not here for consideration, and, for that reason, it was not mentioned in the opinion.

The motion further says:

"The statement of fact is also inacurate and incomplete in other respects. The full presentation of the uncontradicted facts in this record should, in all fairness, include the admission by Coach Miller as to what he did to the pole before turning it over to the plaintiff. The coach testified as follows:

"Q. What did you do with it? A. I did not even put it up against the well; there was just one end on the floor and I took a hold of it at the height, thinking I had a sixteen foot pole and pressing down on it. Now, I was afraid to press too hard because I weigh one hundred sixty-five pounds and Gene only weighed one hundred twenty.

"Q. Did you turn the pole over and do it again? A. I did not.

"Q. You just tested it on one side? A. Yes.

"Q. And gave it to the boy? A. Yes, sir.

"Q. Do you generally do that, just test them once? A. No.

"Q. There was nothing in this pole to indicate to you that it was a dangerous pole, was there? A. No, sir.

"Q. You would not have given it to the boy if you thought it was dangerous? A. I would not.

"Q. You thought the pole was all right after you put it on the floor and pushed on it? A. I thought it was all right before that.

"Q. You looked at it before that? A. Yes.

"Q. And you thought it was all right? A. I had never gotten a pole that I was able to break before; there was no reason why I should suspicion it being a defective pole."

We have set out the above questions and answers, not because we believe any of them save the ones mentioned in the opinion have any value in determining whether plaintiff made a submissible case, but because the defendant seems to deem that evidence important.

The motion further says:

"There are other misstatements of the evidence resulting from the commissioner's misapprehension of the rules as to the consideration of the evidence. There is no evidence in this record which justifies the commissioner's characterization that the first pole purchased on March 4, 1937, had a 'defect' when the uncontradicted evidence in this record is that the March 4th pole continued to be used at the high school.

"Likewise it is difficult to understand why the commissioner has stated that 'the pole was then painted.' The uncontradicted evidence

was merely that the first grade poles had red paint on the lower joints as an identification."

The charge the opinion could not properly say the pole of March 4 had a defect is not warranted by the record. The pole was not straight, was unbalanced, and, therefore, according to Webster and the New Century Dictionary, it had a defect. The claim the opinion should not have stated "the pole was then painted" is likewise unfounded.

Freeburg, defendant's vice president and its witness, testified that defendant maintained a store in each of several cities throughout the United States; that when any of said stores, other than the one in Kansas City, received an order for a vaulting pole the order was forwarded to defendant at Kansas City and the pole was prepared in the latter city. And—

"Q. Now, as I understand then, each one of these stores, except the ones where the orders are filled from Kansas City, receive their own shipments of bamboo poles in the raw from Japan? A. They do not.

"Q. Where do they get them from? A. They get them from us complete, from Kansas City.

"Q. Oh, the complete poles, you get them here in the raw and cut them off? A. Yes.

"Q. Tape them, paint them, plug them, do whatever is necessary in order to make them usable? A. That is correct.

"Q. This is the place of manufacture of these poles. A. That is right."

The claim the opinion is erroneous in "taking part of a witnesses testimony and ignoring the explanatory portions thereof" overlooks the established rule that a jury may believe all of the evidence of a witness or none of it or reject it in part and accept it in part. [Gould v. Chicago, B. & Q. R. Co., 315 Mo. 793, 290 S. W. 135.]

At the request of the author of the main opinion herein, the court has examined the record with care and finds that every fact necessary to the disposition of the questions at issue on appeal has been accurately and fully stated, and that no material fact had been omitted.

The motion for rehearing is overruled. *Sperry, C.,* concurs.

PER CURIAM:—The foregoing opinion of CAMPBELL, C., is adopted as the opinion of the court. The motion for rehearing is overruled. All concur except *Cave, J.,* not sitting.