ETHLYN TAYER v. YORK ICE MACHINERY CORPORATION, a Corporation, Appellant.—119 S. W. (2d) 240.

Division Two, August 17, 1938.*

*NOTE: Opinion filed at September Term, 1937, December 17, 1937; motion for rehearing filed; motion overruled May 3, 1938; motion to grant a rehearing and to transfer to Court en Banc filed; motion overruled at May Term, 1938, August 17, 1938.

*Davis & Davis, Oliver Blackinton* and *Watson, Ess, Groner, Barnett & Whittaker* for appellant.

*Stubbs, McKenzie & Stubbs* for respondent.

BOHLING, C.—Action in tort, founded on negligence, against the manufacturer of a chattel. The manufacturer, York Ice Machinery Corporation, appeals from a $10,000 judgment in favor of Ethlyn Tayer for the wrongful death of Milford Tayer, her husband.

Appellant stood upon its demurrer to the evidence at the close of respondent's case.

The York Company sold to John Morrell & Company, a meat packing company, two ammonia compressors, equipped with manifolds, etc. The compressors were installed in the packing plant of the Morrell Company at Topeka, Kansas, in accordance with plans submitted to the York Company. After tests with ammonia by the Morrell Company for possible leaks at about 150 pounds pressure per square inch, the machines were put in operation in June, 1933. We are concerned with the manifold of one of the compressors. The evidence established that the manifold should withstand a pressure of 250 to 300 pounds per square inch; that it had what is known as an intake or suction side, and a discharge side; that, in normal operation at the Morrell plant, the pressure on the intake side would vary from two to thirty pounds and on the discharge side from 125 to 150 pounds and a considerable difference in the temperature would exist on the intake and discharge sides, the intake side showing frost and the discharge side showing temperatures as high as two hundred degrees Fahrenheit; that, from time to time, liquid ammonia will go through a compressor and immediately chill the discharge side, causing rapid variations of from 200 to 250 degrees in the temperature of the casting, and, if present in considerable quantity, cause such machines to "knock" or "pound" badly. The compressor was located in an engine room 60 by 80 feet, with a ceiling about 20 to 22 feet high. It was powered by electricity, controlled by a "push button" on the side of the motor operating, by remote control, a

switch located high up in another portion of the engine room. The opening of this switch, it was not enclosed in oil, would create a large electric spark. The manifold was equipped with four valves—suction, discharge, by-pass and pump out. The functions of the by-pass and pump out valves are immaterial here. In normal operation the pump out and by-pass valves are closed, and the suction and discharge valves open. Out side the engine room there were several places where the flow of ammonia back to the engine room could be shut off; for instance: on the roof of the building and a series of three valves in the packing house. The compressor was in continuous operation from the date of its installation until February 18, 1934, except it was shut down for two or three days in October to make repairs occasioned by a burned out bearing and for a couple of hours each Sunday to clean the oil filters.

The Morrell Company operated its plant twenty-four hours a day, under a schedule calling for three shifts. John Hill was chief engineer, and Ralph Manns was master mechanic of the plant. Milford Tayer, deceased, was shift engineer, and Albert G. Voiles was shift oiler on the shift on duty from three P. M. to eleven P. M. Shift engineers have charge of the plant while on duty, and Mr. Tayer was a highly efficient and competent engineer.

On the afternoon of February 18, 1934, Voiles was in the engine room and about seven o'clock heard a hissing sound, noticed what appeared to be steam escaping and detected the odor of ammonia. Prior thereto the machinery was operating normally. He immediately hurried to notify Engineer Tayer. He located Tayer and they returned to the engine room and were adjusting their gas masks when, about fifteen minutes after the discovery of the escaping ammonia, Chief Engineer Hill arrived and instructed them to "get in there and get it shut off." "Q. Then what happened? A. We went in and Mr. Tayer was ahead of me—I was behind him—and we went directly to this machine, and Mr. Tayer was coming around the machine and I had not got around there yet. I was facing the switchboard, and I looked up and saw a big, gold ball form in front of the switchboard and I made a run for the door and I had not taken over eight or ten steps before the explosion occurred. Q. Did you get out? A. I got blowed out most of the way and finally picked myself up and got out." Witness could hear Tayer screaming in the engine room.

Master Mechanic Manns also testified, in addition to many of the facts hereinbefore set forth, that he arrived at the plant about 7:20 P. M.; that he put on a gas mask; that the men had not been able to shut the valves or do anything beyond stopping the compressor from operating and ammonia was still blowing out; that they kept gas masks there for use when repairing the ammonia lines; that he

went in, found the valves correctly adjusted for the normal operation of the compressor, shut off the suction and discharge valves on the compressor, shut off the flow of ammonia, closed down the rest of the machinery that was running, called the power company and had them pull the fuses on the main lines coming into the plant; that after the room had cleared of ammonia an inspection disclosed a crack of considerable length on the discharge side of the manifold, varying in width from a fine hair line crack up to say one-eighth of an inch; that "I think the crack was caused by the rapid changing temperature in the manifold and due to flaws in the manifold—inherent weakness in the manifold itself;" and that the casting was expected to withstand changes in temperature. Respondent also developed from this witness testimony as follows: "Q. I will get you to tell the jury if you know whether ammonia gas is explosive. A. Yes; it is explosive. Q. State whether or not that is a matter of common knowledge? A. It is quite common knowledge. It is in all refrigeration tables and books. . . . Q. That is a matter of common knowledge among all refrigerating companies? A. Yes;" and that when certain mixtures of ammonia with air exists, commonly known as within the combustion range, an explosion will occur whenever the temperature of the mixed gases reaches the ignition point.

Mr. Tayer was taken to a hospital. He died March 1, 1934.

The litigants reason the principal issues from the case of McLeod v. Linde Air Products Co., 318 Mo. 397, 403 (II), 1 S. W. (2d) 122, 124 (1), 126 (2-4). McLeod's father purchased manufactured oxygen in steel tanks, having an outlet valve at the top of the tank, from Linde Air Products Company. The tanks remained the property of the Linde Company and were returned when empty. Fifteen minutes after the delivery of a tank, an employee undertook to permit oxygen to flow from the tank. He discovered the oxygen was not flowing and, concluding the tank was empty, placed it to one side without closing the valve. However, the valve had become clogged by rust and other substances and, being subject to a pressure of eighteen hundred pounds per square inch, in a few seconds the gas suddenly escaped in an explosive manner through the valve, injuring plaintiff. Water was discovered in the tank. The court stated the general rule and exceptions as follows:

" 'The general rule is that a contractor, manufacturer, vendor or furnisher of an article is not liable to third persons who have no contractual relations with him for negligence in the construction, manufacture or sale of such article.' [2 Cooley on Torts (3 Ed.), pp. 1486 et seq.]

"There are three exceptions, stated in 29 Cyc. 478, as follows:

" '1. Where the negligent act is imminently dangerous and is

920

committed in the preparation or sale of an article intended to pre-serve, destroy, or affect human life; (2) where the act is that of an owner combined with an invitation to the party thereby injured to use the defective appliance on such owner's premises; (3) where the act consists in the sale and delivery of an article with knowledge of undisclosed danger and without notice of its qualities, whereby any person is injured in a way that might reasonably have been expected.'" [Consult Huset v. J. I. Case T. M. Co., 120 Fed. 865, 867, 870.]

The McLeod case concluded: "The early cases limited exception 1 to things in their nature destructive, such as poisons, explosives, and deadly weapons. . . . We think the exception should be extended to include 'a thing which when applied to its intended use becomes dangerous,' although not inherently so. There is no reason why the principle should not apply to things imminently dangerous, whether inherently so or not."

Respondent asserts the instant case falls within exception one mentioned in the McLeod case. The McLeod case and the cases next mentioned do not limit said exception to "an article intended to preserve, destroy or affect human life;" and are in accord with the trend of current authority. [Consult Restatement of the Law of Torts, p. 1074, sec. 395, comment b.]

■ The cases stressed by respondent and more directly in point are devoted principally to a discussion of the ambit of liability of the manufacturer; i. e., those to whom under the law he owes a duty. Respondent also relies upon them for the establishment of defendant's actionable negligence under the testimony of the instant case. They are: MacPherson v. Buick Motor Car Co., 217 N. Y. 382, 111 N. E. 1050, L. R. A. 1916F, 696, Ann. Cas. 1916C, 440; Devlin v. Smith, 89 N. Y. 470; Johnson v. Cadillac Motor Car Co., 261 Fed. 878, 8 A. L. R. 1023; Keep v. National Tube Co., 154 Fed. 121. These cases, as well as the McLeod case, do not impose upon a manufacturer the obligation of an insurer. The action sounds in tort, is based on negligence, and the legal obligation cast by the cases upon a manufacturer requires the exercise of due care in manufacturing and marketing merchandise imminently, intrinsically, inherently or essentially dangerous in itself or when applied to its intended use. Note the following bearing on actionable negligence: In the MacPherson case (which, as did the Johnson case, involved an automobile accident occasioned by a defective wheel): "There is evidence, however, that its (the wheel's) defects could have been discovered by reasonable inspection, and that inspection was omitted." [L. R. A. 1916F, 1. c. 697.] The Johnson case followed the MacPherson case (8 A. L. R. 1. c. 1028) and stated (1. c. 1026): ". . . defendant ought to have known it (the defective condition of the wheel when the automobile

was manufactured, assembled and marketed), and, had it exercised ordinary care, would have known it. . . . The court found that defendant carelessly and negligently failed and omitted to use reasonable inspection and tests to discover the real condition and weakness of the wheels.'' In the Devlin case there was positive proof of defendant's negligence: ''One witness . . . testified that the upright which supported the end of the ledge should have been fastened to it by lashing with ropes, instead of by nailing. . . .'' [89 N. Y. l. c. 474.] The Keep case was concerned with the petition and stated: ''The gravamen of the complaint is negligence. . . . The question, then, is . . . whether it (defendant) owed to Keep the duty of reasonable care in the manufacture of the cylinder. . . . If the explosion was due solely to negligence in the manufacture of the cylinder, why should not the manufacturer respond in damages for its negligence?'' [154 Fed. l. c. 128.] And (l. c. 130): ''Undoubtedly, care must be taken not to extend the rule of liability in negligence cases to remote consequences. In every such case liability must be limited to injury which is the proximate and the natural result of a breach of duty owing by the defendant to the plaintiff.'' The McLeod case did not extend the rule beyond the limits announced in the MacPherson case. The existence of water and rust was established by substantial evidence and the instruction therein quoted required a finding of specific negligence. Extensive reviews of the authorities may be found in connection with the annotations in 17 A. L. R. 672; 39 A. L. R. 992; 63 A. L. R. 340; 88 A. L. R. 527; 105 A. L. R. 1502; and the subject matter is also treated in the Restatement of the Law of Torts, pp. 1073-1085, secs. 394-398.

If respondent's witness's testimony to the effect that he thought the crack was caused by the rapid changes of temperature and flaws in the manifold and that the manifold was expected to withstand rapid changes in temperature and a pressure of three hundred pounds per square inch be considered substantial evidence of a defect in the manifold, such defect, as alleged in respondent's petition, was a ''latent'' defect; and, giving consideration to the testimony that the Morrell Company's test failed to disclose leaks at a pressure of 150 pounds; that the manifold was continuously operated by Morrell Company for a period of approximately eight months free from the control and right of control by appellant, during which time it was subject to the flow of and pressure from ammonia, to rapid changes in temperature and ''knocks'' occasioned by liquid ammonia, which admittedly would tend to have effect on the casting, actionable negligence on the part of appellant in the manufacture or in the due inspection and test of the manifold for defects remains too much in the beclouded realm of conjecture and surmise to war-

rant its indulgence. [Consult O'Donnell v. Baum, 38 Mo. App. 245, 249 (to the effect that the mere existence of a latent defect in a machine does not necessarily establish a prima facie case of negligence on the part of a master to keep the machine in repair); 39 C. J., p. 1056, sec. 1269; 10 C. J., p. 954, sec. 1373.] The instant facts do not make out the case made in the MacPherson, Devlin, Johnson, Keep, or McLeod cases, supra; and there is a lack of substantial testimony on the issue of appellant's actionable negligence unless it is to be inferred from the "cracking" of the manifold.

■ Respondent, stressing Stolle v. Anheuser-Busch, Inc., 307 Mo. 520, 271 S. W. 497, 39 A. L. R. 1001, says the instant case comes within the *res ipsa loquitur* rule. The Stolle case affords interesting study for analysis when read in the light of the cases therein mentioned (also cited by respondent). They, broadly speaking, apply the rule to cases wherein a sealed bottle of carbonated beverage explodes when supported by attending testimony establishing the proper handling of the bottle subsequent to its leaving the control of the manufacturer of the beverage. The *res ipsa loquitur* rule is a qualification of rather than an exception to the general rule of evidence that negligence must be affirmatively proved in that it relates to the mode rather than the burden of establishing negligence. It springs not from the fact of injury but from the facts attending the occurrence; and in its strict and distinctive sense differs from circumstantial evidence in that it may be said to rest upon the generic circumstances peculiar to the class of physical causes producing the occurrence while circumstantial evidence rests upon specific circumstances peculiar to the individual occurrence. Wigmore on Evidence (2 Ed.), Vol. 5, p. 498, sec. 2509, observes: "What the final accepted shape of the rule will be can hardly be predicted. But the following considerations ought to limit it: (1) The apparatus must be such that in the ordinary instance no injurious operation is to be expected unless from a careless construction, inspection, or user; (2) Both inspection and user must have been at the time of the injury in the control of the party charged; (3) The injurious occurrence or condition must have happened irrespective of any voluntary action at the time by the party injured. It may be added that the particular force and justice of the presumption, regarded as a rule throwing upon the party charged the duty of producing evidence, consists in the circumstance that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to him but inaccessible to the injured person." (Consult also L. R. A. 1917E, 4, 120 et seq.; 20 R. C. L. 184-194, secs. 155-160, 45 C. J., pp. 1193-1216, secs. 768-781; McCloskey v. Koplar, 329 Mo. 527, 533 (I), 46 S. W. (2d) 557 (1, 2) (control includes the right of control); Mayne v. Kansas City Rys. Co., 287 Mo. 235, 248, 229 S. W. 386, 390 (7);

Beebe v. St. Louis T. Co., 206 Mo. 419, 441, 103 S. W. 1019, 1025, 12 L. R. A. (N. S.) 760, 767; Removich v. Bambrick Bros. Con. Co., 264 Mo. 43, 49, 173 S. W. 686, 687, L. R. A. 1917E, 233, 235, (stating: "To make out a case for the application of this doctrine, the facts relied on ought to be such as reasonably to exclude all defensive inferences attributable by operation of law to the negligence of the plaintiff or that of a fellow-servant (absent a fellow-servant statute), defects in the lethal instrumentality which are latent or so recent in happening as to afford no reasonable opportunity for their discovery, lack of causal connection, and the assumption of the usual hazards of the employment"); Svast v. White (Mo. App.), 5 S. W. (2d) 668, 669 (1); Gibbons v. Wells (Mo. App.), 293 S. W. 89, 92 (5).)

Observations made in connection with the last previous issue are applicable here. Principally, they relate to the exclusive possession and control of the manifold by the Morrell Company, without any right of possession or control in appellant; the subjecting of the manifold by the Morrell Company to the flow and pressure of ammonia, rapid changes in temperature, and "knocking" or "pounding" from liquid ammonia. With reference to such matters, as well as other possible contingencies that may have had a bearing upon the proper maintenance and the functioning of the manifold during said eight months' interval, appellant did not have legally superior accessibility. (Consult Klebe v. Parker Distilling Co., 207 Mo. 480, 491, 105 S. W. 1057, 1060, 13 L. R. A. (N. S.) 140, 144.) Fundamental factors differentiate the instant case from cases involving merchandise inflicting injury upon first or prior to being put to its intended use, especially food and drink intended for human consumption, marketed in sealed containers (a factor in the McLeod case) precluding interference and intervention by third parties. The testimony in the instant case does not bring it under the authorities wherein a plaintiff's case has been held to be aided by the *res ipsa loquitur* rule.

Appellant says the cracking of the manifold was not the proximate cause of Tayer's injuries, stressing, among others, the Eversole, McManamee, Logan and Johnson cases, infra.

In Eversole v. Wabash Railroad Co., 249 Mo. 523, 538, 540, 541, 155 S. W. 419, 424, 425, cars had negligently been permitted to become separated from an engine in a switching movement. Thereafter, plaintiff voluntarily mounted the engine in an effort to aid in the capturing and stopping of the cars. The court noted (249 Mo. l. c. 539, 540), under the facts involved, that for one to assert original negligence against a defendant it must be established that some one was in peril and that he acted from humanity's sake to rescue such person. The Eversole case, however, is ruled upon the principle quoted (l. c. 541) from a syllabus of Eckert v. Long Island

Railroad Co., 43 N. Y. 502, reading: " 'A person voluntarily placing himself, for the protection of *property* merely, in a position of danger, is negligent, so as to preclude his recovery for an injury so received.' " See defendant's Instruction No. 3, and the ruling thereon, in McManamee v. Missouri Pac. Ry. Co., 135 Mo. 440, 446 (3), 449 (III), 37 S. W. 119, 120, 121. In Logan v. Wabash Railroad Co., 96 Mo. App. 461, 466, 70 S. W. 734, 735, 736, plaintiff was severely burned while attempting to save some hay from a fire negligently communicated to a field by sparks from defendant's engine. The court said (96 Mo. App. l. c. 465): "Here the act of the plaintiff in attempting to extinguish the fire appears to have been the cause of plaintiff's injury, and not the wrongful act of defendant in suffering the fire to escape from its engine in the first instance;" and concludes (l. c. 466): ". . . the setting out of the fire by the defendant was not the proximate cause of plaintiff's injury."

Respondent says appellant overlooks "the doctrine of concurrent negligence; and that where the negligence of the appellant is shown and it appears that but for his negligence the accident would not' or could not have happened, then his negligence is at least a concurring proximate cause and he is still liable;" quoting from the Missouri cases of Harrison v. Kansas City El. L. Co., 195 Mo. 606, 622 (I), 93 S. W. 951, 956 (1); Buckner v. Stock Yards H. & M. Co., 221 Mo. 700, 708 (I), 120 S. W. 766, 769 (1); Dean v. Kansas City, C. & S. Ry. Co., 156 Mo. App. 634, 137 S. W. 603. In the Harrison case "grounds" existed in defendant's electric transmission line, one having been occasioned by Harrison's son. Defendant's "trouble man" failed to locate the trouble on a particular circuit, concluded that circuit was "O. K." and so reported it. After the current had been turned on for about fifteen minutes Harrison took hold of a swing in his yard and was instantly killed. Harrison had not been warned and did not have any knowledge of danger from the swing. The court said (195 Mo. l. c. 627); "Under the circumstances, there is no escape from the conclusion that the defendant was negligent in turning on the current of electricity after it knew that there was trouble, without making a test at the main office to discover the true state of affairs, and without positively knowing that the trouble had been remedied. The fact that its negligence would not have resulted in the injury complained of except for the independent intervening negligence of the son of the deceased does not relieve the defendant from liability, for the act of the son of the deceased could not have produced the injury unless the defendant had turned on the current of electricity, nor unless there had also been a second ground somewhere else." In the Buckner case a servant was injured by reason of the unsafe condition of a gate at a stock yards, permitting him to be caught between the gate and part of the fence by a rush of

somewhat wild horses. The servant was not expected to make repairs, had knowledge of the condition and had notified his foreman, who had promised to make the necessary repairs. The court, giving consideration to the negligence of the master in failing to maintain the place and appliances in a reasonably safe condition, the master's knowledge of the unsafe condition, the master's direction that the act involved be performed by the servant and the servant's compliance therewith, held a case made and, following the Harrison case, that the act of the horses was not the sole proximate cause of the servant's injuries. The Dean case is distinguished in the Johnson case, infra (320 Mo. l. c. 890, 8 S. W. (2d) l. c. 893).

Respondent also refers us to the opinions in Slinkard v. Lamb Const. Co., of the Court of Appeals (212 S. W. 61), discussing an issue of contributory negligence, and the Supreme Court en Banc (286 Mo. 623, 225 S. W. 352) upon certification on account of conceived conflict with the McManamee, Eversole, and Logan cases, supra, as affecting the holdings in said cases. Slinkard, an employee of a fuel company, was unloading a coal wagon at defendant's quarry when, without warning, defendant discharged a "squib shot" in the quarry and frightened the horses. Slinkard immediately undertook to stop the team but when he was about to take hold of one of the bits, "a second blast was shot in the quarry below, *adding* to the fright of the horses, *so that* (Slinkard)" was thrown down, trampled upon and injured. (Italics ours.) A reference to the record indicates Slinkard's petition was founded upon the second blast; and a reading of the Court of Appeals' opinion indicates Slinkard's injuries were the result of the second explosion and that the negligence assigned was "the failure on the part of the defendant to give a warning of the intention to fire the shot" (212 S. W. l. c. 62). The Court en Banc was unable to see any conflict between the cases.

In Johnson v. Terminal Railroad Assn., 320 Mo. 884, 888, 893, 8 S. W. (2d) 891, 892 (2), 895 (4), a Banc case, one Sherman was supposed to stop a car by "chocking" it. He negligently failed to perform this duty; and Nexsen, another employee, was injured in attempting to "chock" the car to prevent its collision with and damage to certain loaded freight cars. The court held "that the negligence of Sherman was not the proximate cause of Nexsen's injury. Sherman's failure to chock the moving freight car when it reached him was merely one of the conditions which brought about the situation making possible the accident and injury to Nexsen;" and ". . . this state does not recognize the application of the 'imminent peril' doctrine where mere property damage is involved." The court states Nexsen's act in attempting to "chock" the car to prevent damage to his employer's property was not in line with Nexsen's duty. However, in the McManamee case deceased was attempting to save his

own property, and in the Logan case was attempting to save property in which he had an interest. The distinction between the rules governing the rescue of persons and of property seems to rest upon that high regard in which the law holds human life and limb; whereas when mere property is involved one may not voluntarily subject another to greater liability than that which he seeks to avert. GRAVES, C. J., the writer of the Buckner opinion, in the later case of State ex rel. v. Ellison, 271 Mo. 463, 474, 196 S. W. 1088, 1091 (2), speaking for the Court en Banc, said: ". . . the established rule of this court is that if the injury, as occasioned, was not one which could have reasonably been anticipated as a sequence of the alleged negligent act, then the alleged negligent act was not in law the proximate cause of the injury, and no recovery can be had therefor."

Many factors enter into the determination of cases of this nature; factors involving the nature and use of the instrumentality, the defect therein, the relationship existing between the litigants, the extent of the obligation of the defendant, the legal status of the act of the injured party, as well as others; and it appears the better reasoned decisions approach the legal solution of these problems of modern social life under a policy of inclusion and exclusion in the application of the controlling principle of law to the facts of the individual case rather than by attempting to announce general rules designed to embrace a number of the factors involved.

This is not a master and servant case. Appellant had no control or right of control over any instrumentality or actor to the occurrence. A manufacturer's obligation, although analogous to, is not that of a master to his servant, and, under the facts of the instant case, he should occupy a more favorable position in law than the master. Tayer was not injured by the cracking of the manifold or by the escaping of ammonia gas therefrom. When he arrived at the engine room and procured a gas mask he was not in a position of danger. When he entered the room in obedience to the instructions of his superior, so far as appellant is concerned the master's instructions and Tayer's obedience thereto were voluntary acts of the parties involved unattended by any subsequent act chargeable to appellant contributing to the occurrence. Respondent proved that it was common knowledge among all refrigerating companies that ammonia gas is explosive and that Tayer was a highly efficient and competent engineer. This explosive gas was loose in the room. Tayer knew this condition existed. His injuries were the result of the explosion of this gas and was occasioned by the electric spark from the panel switch when he operated it by remote control. His efforts were directed towards the remedying of a condition which then existed for the protection of his master's property. The mere concurrence of negligence and injury does not necessarily render a defendant

liable. One without any right of possession or control should not be required to search for and guard against occurrences occasioned by acts of others which reasonably prudent persons would not anticipate. So, however much the occurrence arouses our sympathy, we think, under the authorities relied upon by appellant, the legal aspect of this issue precludes a recovery against appellant; and the judgment should be reversed. It is so ordered. *Cooley* and *Westhues, CC.*, concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.

### ON MOTION FOR REHEARING.

PER CURIAM:—Morris v. E. I. Du Pont de Nemours Co., 341 Mo. 821, 109 S. W. (2d) 1222, stressed in respondent's motion for rehearing, was not overlooked although not mentioned in the opinion.

The Morris case involved an explosive, dynamite. Due care varies with the danger involved and is proportionate thereto. The use of nitroglycerine when imperfectly compounded with other substances into hypersensitive and superpowerful dynamite exposes the user to probable and extraordinary hazards of bodily harm and the manufacturer is required to exercise almost, if not, meticulous precautions to secure substantial perfection. The first intended user of the dynamite would destroy it and its hypersensitive and superpowerful qualities remained intact from date of manufacture to date of user, when upon first being put in the usual manner to its intended use it directly inflicted injury upon Morris. The Morris case possessed certain features analogous to the Stolle case, as well as the McLeod case, mentioned in the opinion. In the instant case Tayer's employer operated the manifold for several months. Neither the "cracking" of the manifold nor the escape of ammonia gas from the crack in the manifold inflicted injury upon Tayer. These and other factors readily distinguish the cases.

Plaintiff may have a cause of action against decedent's former employer, embracing liability for giving a negligent order. Plaintiff, however, is not suing the master. This, with reference to proximate cause under the facts before us. A reading at the pages indicated of Smith v. Twin State Gas & El. Co., 83 N. H. 439, 449, 450, 144 Atl. 57, 62 (8, 9), 61 A. L. R. 1015, 1025 (stressed in respondent's motion), a case wherein liability hinged upon a hidden and exceptional danger known to and under the control of defendant and of which decedent was entitled to warning, discloses that is not this case. The Missouri cases sufficiently cover the law upon the issue.

The motion for rehearing is overruled.