John STEVENS, Appellant,

v.

DURBIN–DURCO, INC., a Corporation, Respondent.

No. 50091.

Supreme Court of Missouri,

Division No. 1.

April 13, 1964.

Walter J. Gelber, Gray & Jeans, by James W. Jeans, St. Louis, for plaintiff-appellant.

Evans & Dixon, Ralph C. Kleinschmidt, A. J. Seier, Jr., St. Louis, for defendant-respondent.

HOUSER, Commissioner.

Action by John Stevens for damages for personal injuries sustained by him while using a "load binder," a device manufactured by defendant, Durbin-Durco, Inc. At the conclusion of plaintiff's case the court sustained defendant's motion for a directed verdict. Plaintiff has appealed from the ensuing judgment for defendant. We have jurisdiction since plaintiff prayed for $95,000.

Plaintiff charged negligence in several particulars, including negligent failure to equip the load binder with a safety ratchet to prevent kick-back, in connection with the allegation that defendant designed, manufactured, distributed, sold and put into the flow of commerce devices known as load binders, and that plaintiff was injured as a result of defendant's negligence, while using a load binder made by defendant. Defendant filed a general denial and pleas of contributory negligence and assumption of risk.

Plaintiff's evidence tended to show these facts: Plaintiff, a truck driver with 16 or 17 years' experience, and a fellow driver, Bill Macklin, were securing a load onto a flat-bed truck trailer by the use of a chain and a load binder, both of which were supplied by plaintiff's employer (who was not a party to this action). One end of the chain was hooked onto a metal lip on the bed of the trailer, and the chain was stretched over the load. The other end of the chain was then hooked onto the other side of the trailer bed. The function of the load binder was to take the slack out of the chain, thus providing a snug, tight attachment of the load to the trailer. A load binder consists of a cam action lever with a link and a hook on each end. The lever is 8 or 10 inches long. The mechanical principle is that of moving a lever through an arc. In one position the lever is open, and in the other it is closed. With the lever in open position each of the hooks is secured in the binding chain, then the movement of the lever through an arc of 180 degrees to a closed position draws the hooks together, thus tightening the chain. As the lever swings through the arc and reaches a closed position the mechanical advantage, and therefore the tension, increases. Swinging the lever through the arc is similar to compressing a spring, in that energy is stored into the load binder. At the end of the arc the pressure increases to its maximum, and if the pressure exerted is sufficient the handle of the device locks into a fixed position. Before reaching the closed or locked position the operator depends upon his own ability to hold the stored energy. A 200-pound man using the normal maximum force to close the lever would store 200 foot pounds of energy, i. e., that energy needed to raise 200 pounds one foot. By slipping a long pipe over the handle-lever the leverage is increased. About 90% of the time extension pipes, called "cheaters," are used, and according to an offer of proof defendant's literature stated that the load binder was designed to withstand the use of a cheater. Two men of normal capacity using a cheater pipe doubling the length of the handle-lever could store approximately 800 pounds of foot energy. Men working with the lever chest high, pulling down with their shoulders and arms, could use their total weight to the best advantage. If for some reason the force on the handle-lever with the cheater pipe on it is removed the 800 foot pounds of energy would be released. The use of the pipe introduces several dangers: the pipe might become loose and slip; the arc would be larger, necessitating a

change of position by the men swinging the pipe through the arc, with the possibility of their losing their grip or footing; the pipe is free to come loose if the pressure on the end of the pipe is released; if so released, the area of danger is increased. The men choose the cheaters to be used, which come in different lengths, and determine how much pressure to exert on the binder to tighten the chain.

Plaintiff was familiar with load binders, especially this type, which are in general use in the trucking industry. He had daily experience for years in binding and unbinding loads. Plaintiff knew that the longer the arm the greater the leverage and the more force that is overcome; that by doubling the length of the arm the same tension can be overcome with one half the force, and if quadrupled, only one quarter of the force would overcome the same resistance; that the further you bring the lever over the more resistance is built up in the handle. Plaintiff knew that "this thing was under tension and under pressure * * * and if you gave up on the thing, it could come back"; that the more tension it is under the more violently it will fly back, and if someone is leaning on it and it is released "it is going to come back" and "they are going to get hurt," and that he was aware of these characteristics and knew this on the day of the accident and up to the very instant of the accident. Plaintiff had no information about the "statistics" involved, or the technical considerations; precisely what mechanical advantage the device afforded or his own capacity applying force to the lever, or of the force stored and how that force would be affected by the use of the cheater pipe, but he did know that "when she springs open she springs open with a terrific force; if the pipe would come off she would come out like a bullet, maybe sail half-way up the block * * *."

When the load binder was first closed the chain was still too slack. After going up to the next link plaintiff and Macklin got on opposite sides of the handle and attempted to close the load binder. The chain ran vertically up the side of the load. A 30-inch-long cheater pipe was placed on the handle-lever and slipped almost to the bottom of it—about 8 or 10 inches—thus increasing the length of the handle-lever to 20–22 inches. Plaintiff and Macklin, using their hands, pushed down on the pipe. The lever was almost to the breaking point when the accident happened. Just before it happened, and when the handle-lever was "almost to the breaking point," plaintiff told Macklin to get his head out of the way "before it tears it off." The men exerted and used up all of their strength and energy, but it was too much strain for them to pull the handle-lever down all the way, and the tension on the binder overcame them. There was so much tension that the pipe turned sideways and came up, striking plaintiff on the side of the face, inflicting very serious injuries. The chain did not break. The load did not shift. The load binder did not break. None of the parts gave way. There was no structural failure. The men did not let go, nor did they lose their footing. The pipe extension was seated firmly, and did not slip. The pipe extension did not come off the handle, but remained over the handle, perfectly tight at all times, just as if it were a part of the handle. After the accident Macklin and another man put a longer cheater pipe (a 6-foot cheater) over the handle-lever of the binder, and using that additional leverage bound that same load for the trip.

Plaintiff offered to prove that there had been in common use in the trade a simple safety ratchet device, well-known in engineering circles and by manufacturers, which allows the storing of energy in a mechanical device such as a load binder, but which would prevent the sudden and complete release of the stored energy in the event the force was dissipated or no longer applied to the end of the handle-lever; that such a device could have been employed reasonably and effectively on this load binder; and that the use of such a safety device would have prevented the

pipe from being released suddenly through its entire arc.

Plaintiff asserts that his evidence and the reasonable inferences therefrom present a jury issue as to whether the load binder when put to its intended use created a reasonable likelihood of substantial harm, thus creating a duty on defendant's part to use reasonable care to avoid harm to plaintiff; that the imposition of a duty by the manufacturer to a user of its product does not depend upon whether the article is inherently dangerous (as implied in the circuit court's ruling) but rather whether it is dangerous when applied to its intended use; that reasonable men could find that this product was dangerous when applied to its intended use in that "the forces which users of the product were dealing with were of sufficient magnitude and there were no safety devices to prevent the sudden release of these forces in a manner endangering life and limb of the user." Plaintiff says defendant was obligated to exercise ordinary care to eliminate the danger before exposing a user of its product to such risk, where the manufacturer had "knowledge of some potential danger."

Plaintiff further asserts error in the court's ruling that plaintiff is barred because he assumed the risk, contending that plaintiff's conduct cannot bar him unless he voluntarily exposed himself to a known and appreciated danger, one glaringly obvious, thoroughly comprehended and appreciated, and that the conclusion must be inevitable that plaintiff freely consented, without constraint, to the risk.

Finally, plaintiff says the court erred in denying recovery on the ground that defendant's product had no latent defect and that the lack of a safety ratchet was open and obvious.

■ This case is based upon negligence, not on breach of implied warranty.[1] Plain-

tiff is a remote user of the product. Defendant is the manufacturer. There are no contractual relations between the parties. The defense is that there was no negligence, not that plaintiff cannot sue because of the lack of privity. This case comes under the exception to the requirement of privity of contract applicable to products dangerous because of the use to which they are to be put by whoever may use them for the purpose intended. Orr v. Shell Oil Co., 352 Mo. 288, 177 S.W.2d 608, 612[2]; McLeod v. Linde Air Products Co., 318 Mo. 397, 1 S.W.2d 122; Hursh, American Law of Products Liability, Vol. 1, § 6:92, p. 714, fn. 16.

■ The manufacturer of a product which is potentially dangerous when applied to its intended use, Tayer v. York Ice Machinery Corp., 342 Mo. 912, 119 S.W.2d 240, or reasonably certain to place life and limb in peril when negligently made, Zesch v. Abrasive Co. of Philadelphia, 353 Mo. 558, 183 S.W.2d 140, 145, 156 A.L.R. 469; McLeod v. Linde Air Products Co., supra; Jacobs v. Frank Adams Electric Co., Mo. App., 97 S.W.2d 849; Restatement, Law of Torts, § 395, is under a duty to a remote user to exercise ordinary care in its manufacture, and is liable to a remote user injured thereby if the injury results from a latent defect bespeaking lack of ordinary care in making the product. Zesch v. Abrasive Co. of Philadelphia, supra (abrasive cutting-off wheel exploded); McLeod v. Linde Air Products Co., supra (clogged valve in an oxygen tank); McCormick v. Lowe & Campbell Athletic Goods Co., 235 Mo.App. 612, 144 S.W.2d 866 (bamboo vaulting pole broke); Jacobs v. Frank Adams Electric Co., supra (electric panel board exploded).

■ But the manufacturer is not liable as an insurer, and he is under no obligation to make the product accident proof or

---

1. See Morrow v. Caloric Appliance Corporation, Mo.Sup. (en banc), 372 S.W.2d 41, based on implied warranty of fitness and safety, in which it was held that privity of contract between the ultimate purchaser and the manufacturer need not be shown in the case of damage from a hidden defect in a manufactured product.

foolproof. Stevens v. Allis-Chalmers Mfg. Co., 151 Kan. 638, 100 P.2d 723, 726-727; Campo v. Scofield, 301 N.Y. 468, 95 N.E.2d 802, 804; Yaun v. Allis-Chalmers Mfg. Co., 253 Wis. 558, 34 N.W.2d 853, 858. Since practically any product, regardless of its type or design, is capable of producing injury when put to particular uses, "a manufacturer has no duty so to design his product as to render it wholly incapable of producing injury, * * *." Hursh, American Law of Products Liability, Vol. 1, § 2:59, p. 240. The manufacturer of a butcher knife, cleaver, or axe, properly made and free of latent defects and concealed dangers, may not be held liable merely because someone was injured while using the product. Thus a manufacturer is not liable to a man who while using an iron dumbbell drops it on his foot. Jamieson v. Woodward & Lothrop, 101 U.S.App.D.C. 32, 247 F.2d 23, cert. den. 355 U.S. 855, 78 S.Ct. 84, 2 L.Ed.2d 63.

■ The extent and limits of the duty of a manufacturer of a product dangerous because of the use to which it is to be applied depend upon the nature and character of the defect and of plaintiff's knowledge thereof. As indicated by the Zesch, McLeod, McCormick and Jacobs cases, supra, the manufacturer may be held liable if the defect or danger is latent or concealed, but where the danger is open, obvious and apparent, or the user has actual knowledge of the defect or danger, there is no liability on the manufacturer. Parker v. Heasler Plumbing & Heating Co., Wyo.Sup., 388 P.2d 516, 518, and cases cited: Tyson v. Long Mfg. Co., (1959) 249 N.C. 557, 107 S.E.2d 170, 78 A.L.R.2d 588; Rosebrock v. General Electric Co., 236 N.Y. 227, 140 N. E. 571; MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696. In Campo v. Scofield, supra, the New York Court of Appeals said: "Suffice it to note that, in cases dealing with a manufacturer's liability for injuries to remote users, the stress has always been upon the duty of guarding against *hidden* defects and of giving notice of *concealed* dangers."

The duty of the manufacturer in such case is satisfied by the manufacture of a product which is free of latent defects and concealed dangers. The rule, stated as lately as January 24, 1964 by the Supreme Court of Wyoming, is that " * * * [T]he manufacturer * * * of a machine, dangerous because of the way in which it functions, and patently so, owes to those who use it a duty merely to make it free from latent defects and concealed dangers. * * * Accordingly, if a remote user sues a manufacturer * * * for injuries suffered, he must allege and prove the existence of a latent defect or a danger not known to plaintiff or other users." Parker v. Heasler Plumbing & Heating Co., supra, 388 P.2d l. c. 518; Campo v. Scofield, Stevens v. Allis-Chalmers Mfg. Co., Yaun v. Allis-Chalmers Mfg. Co., Jamieson v. Woodward & Lothrop, supra; Harrist v. Spencer-Harris Tool Co., 244 Miss. 84, 140 So.2d 558; Kientz v. Carlton, 245 N.C. 236, 96 S.E.2d 14; Standard Conveyor Co. v. Scott, 8 Cir., 221 F.2d 460; Messina v. Clark Equipment Co., 2 Cir., 263 F.2d 291.

If we assume by way of argument that the representations in the manufacturer's literature made the cheater pipe an integral part of the load binder; that the use of a cheater pipe introduced the dangers we have noted and that such dangers were in addition to those inherent in the use of the binder without a cheater pipe, and that the possible dangers by the use of the cheater pipe were in the nature of concealed dangers, such assumptions still would not change the applicable principles or the result under the facts of this case. That is because plaintiff's evidence clearly showed that the addition of the cheater pipe did not play any part in causing of the accident. As noted, the pipe did not slip but fitted tightly at all times as though it were an integral part of the load binder.

■ Is the rule as to latent defects and concealed dangers affected by plaintiff's charge that defendant should have equipped the product with a safety ratchet to pre-

vent "kick-back"? We think not in this case. A manufacturer is not obliged to adopt only those features which represent the ultimate in safety or design. Marker v. Universal Oil Products Co., 10 Cir., 250 F.2d 603; Mitchell v. Machinery Center Inc., (1961) 10 Cir., 297 F.2d 883, 886. A manufacturer is not under any duty "to provide a guard or other protective device to prevent injury from a patent peril or a source manifestly dangerous." Hursh, American Law of Products Liability, Vol. 1, § 2:12, p. 133, citing Strickler v. Sloan, (1957) 127 Ind.App. 370, 141 N.E.2d 863. Accordingly, where the product is free of latent defects and concealed dangers; where the perilous nature of the product and the danger of using it is obvious and not concealed; where its normal functioning creates no danger not known to or appreciated by the user; where it is properly manufactured to accomplish the function for which it is designed, the manufacturer has "satisfied the law's demands" and is under no duty to make it "more" safe by providing a built-in safety device. Campo v. Scofield, Harrist v. Spencer-Harris Tool Co., Kientz v. Carlton, Standard Conveyor Co. v. Scott, Stevens v. Allis-Chalmers Mfg. Co., Yaun v. Allis-Chalmers Mfg. Co., Jamieson v. Woodward & Lothrop, Messina v. Clark Equipment Co., supra.

■ Here the load binder was structurally sound. It did not disintegrate, break down, crack or fail. The perilous nature of the product was obvious and apparent to plaintiff; its lack of a safety ratchet was plain to be seen. Its use created no danger not known to and appreciated by plaintiff, an experienced trucker who had used load binders for years and knew and appreciated full well their dangerous characteristics and propensities. Plaintiff, with this knowledge and appreciation, cannot recover from the manufacturer simply because he was hurt through a mishap in the normal use of the load binder, which reacted in the normal and foreseeable manner anticipated by the user. To so rule would be to make an insurer of the manufacturer. The full measure of defendant's duty was to manufacture a load binder structurally sound and free from any latent defect or concealed danger. The evidence affirmatively shows that the device complied with these requirements. Plaintiff's "injury through the medium of such an agency is neither a probable nor natural result of anything done or left undone by the maker." Bohlen, Studies in the Law of Torts, (1926), p. 126.

Since plaintiff failed to show the existence or breach of any duty owed to this plaintiff we do not reach the question whether the court erred in ruling that plaintiff is barred because he assumed the risk.

Judgment affirmed.

COIL and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.