Maurine **EDWARDS**, Plaintiff-Appellant,

v.

**SPRINGFIELD COCA–COLA BOTTLING CO., INC.,** Defendant-Respondent.

**Nos. 9160, 9161.**

Missouri Court of Appeals,
Springfield District.

May 11, 1973.

Farrington, Curtis & Strong, Thomas Strong, William J. Hart, Springfield, for plaintiff-appellant.

Woolsey, .Fisher, Clark & Whiteaker, Harold J. Fisher, Russell G. Clark, Springfield, for defendant-respondent.

STONE, Judge.

For personal injuries caused by fragments of an exploding bottle, plaintiff Maurine Edwards sued Springfield Coca-Cola Bottling Company, a corporation (hereinafter "Coke"), and Thrifty Foodliner, Inc. (hereinafter "IGA"). In the course of a three-day jury trial, defendant IGA paid plaintiff $12,500 (which was in addition to voluntary pretrial payments aggregating $4,947.96), whereupon plaintiff voluntarily dismissed as to IGA and executed a covenant not to sue that defendant. Proceeding to a conclusion against defendant Coke, plaintiff had a nine-member jury verdict assessing her damages at $25,000 but deducting therefrom (pursuant to instruction 6) the sum of $17,447.96 (the aggregate amount theretofore paid by IGA), leaving a "net amount due" of $7,552.04, for which judgment was entered against Coke. How-

ever, Coke's timely after-trial motion to set aside the aforesaid verdict and judgment and to enter judgment for Coke in accordance with its motion for directed verdict at the close of the evidence was sustained; and from the judgment for Coke then entered, plaintiff appeals. The primary and dispositive issue here is as to whether or not plaintiff presented a submissible case.

During 1965, IGA opened a supermarket on East Commercial Street in Springfield. Edwin R. Jones, Coke's "home market manager" for some twenty years, contacted Gene Hudson, who was in charge of "setting up" this IGA supermarket, and explained the services Coke would provide for such stores. In the ensuing conversation, Jones told Hudson that Coke would construct and install, at its expense, the entire display unit (usually referred to in the transcript and sometimes hereinafter as "the soft drink department") for the display of not only Coke's products but also those of other soft drink bottlers, if in return IGA would allow Coke to choose the location within the soft drink department where its products would be displayed. With this understanding, Coke constructed and thereafter maintained the display unit in this IGA supermarket.

At the time of plaintiff's injury, the soft drink department (moved from its initial location) was in the northwest corner of the market, with the display unit along the north wall, facing south, just west of the meat counter. Although we find no definite testimonial statement on this factual detail, the photographic exhibits indicate that the display unit was some 24 feet in length. The base of the display unit, the bottom shelf (perhaps four inches above the floor), both ends, the five intermediate vertical supports (spaced at intervals of about four feet), and the top shelf (approximately 54 inches above the floor) were constructed of $\frac{3}{4}''$ plywood. In the space between the bottom and top plywood

shelves, three rows of "spring-away" shelves purchased by Coke from the Spring-Away Company in Chicago were affixed to the back of the display unit. According to the only evidence on this subject, "spring-away" shelves were "commonly and generally used" in soft drink display units not only in Springfield but also "around the country."

By examination and measurement of the two "spring-away" shelves received as exhibits in the trial court and presented here, we find that each such shelf was $6\frac{3}{4}''$ in width and either $26''$ or $21''$ in length [1] and was formed by ten small round metal rods mounted in a parallel pattern on, and welded to, four underlying small round metal crossrods. One of those crossrods was at the rear end of the shelf and constituted an integral part of the mechanism affixed to the back of the display unit. Another crossrod was at the front or outer end of the shelf, and the other two crossrods were at intermediate points equidistant from the two ends of the shelf. The ten parallel rods constituting the shelf were spaced at regular intervals on the underlying crossrods, so that the distance between any one of those ten rods and the nearest adjacent parallel rod was no more than three-quarters inch. Each "spring-away" shelf was hinged in the mechanism at the rear end of the shelf and was counter-balanced in that mechanism by a spring of sufficient strength to lift only the weight of the shelf, so that, with nothing on it, the shelf would rise to a vertical position against the back of the display unit. When placed in use, the shelf was pulled down to a horizontal position so that it rested on the cartons of soft drinks on the next lower level. If loaded with such cartons when not so supported by cartons beneath, the shelf would decline below horizontal.

In keeping with the customary practice in supermarkets, a cooler for the dispensa-

---

1. The rods in the lower rows of "spring-away" shelves were 26″ in length, while the rods in the top rows were 21″ in length.

tion of single small bottles of soft drinks was installed just inside an entrance at the southeast corner of this IGA supermarket, and cartons of uncooled small-size bottles, individual 28-oz. and 32-oz. bottles, and individual cans were exhibited in the above-described display unit in the northwest corner of the store. "Practically all" of the top plywood shelf of the display unit was used by IGA "most of the time" for displaying individual large bottles and cans and a few cartons of "no return bottles." Two or more layers of cans frequently were stacked on portions of this top shelf. Cartons of smaller bottles were displayed on the bottom plywood shelf and on the rows of "spring-away" shelves between the bottom and top shelves.

The products of Coke and four other Springfield bottlers, as well as IGA's "privately owned and bottled brand," were displayed in the soft drink department. Of course, each bottler initially stocked its own products, and from time to time thereafter replenished that stock, in a certain designated section of the display unit. Coke's route salesman or "deliveryman" usually came to this IGA soft drink department three times each week; but, during a week when Coke had a "promotion," the deliveryman probably would be there four or five times. Coke's "home market manager" Jones also checked the Coke display "about twice a week." There was no showing as to when or how frequently any other bottler checked its stock in this display unit. Customers in this, as in other, supermarkets handled and frequently left on the floor single bottles removed from cartons in the display unit; and when, on his visits to this market, Jones found any such bottle on the floor, he always placed it in a carton and never set it individually on any shelf.

Late in the afternoon of Friday, April 4, 1969, plaintiff Mrs. Maurine Edwards,

then 59 years of age, went to the IGA supermarket on East Commercial Street, where she had done her "main shopping . . . for a long time." When she entered the store that afternoon, she got a shopping cart, picked up some fruit on the north side of the market, and pushing her cart in front of her proceeded west to the soft drink department where she intended to pick up some canned Pepsi. Observing a lady standing in front of that section of "the pop display," plaintiff stopped behind but "a little to the right of her." Plaintiff's account of the accident on direct examination was that "while she (the other lady) was standing there she moved her [right] foot and tipped a bottle over,[2] a bottle of pop that was sitting on the floor up against the wall by the pop display, and . . . it rolled towards me, not right up to me but almost . . . and she stooped over and picked it up and placed it back . . . where it was in the first place . . . and after she walked on . . . I picked up my two cans of pop, one in each hand . . . and I turned around to put my pop in the basket when I heard this loud noise, it sounded like an explosion . . . ." Plaintiff "never felt one thing" but, when she saw blood and glass on the floor, she looked at her left leg and discovered that it was bleeding. Medical testimony upon trial, which need not be reviewed here, showed that substantial injury, involving severe lacerations of muscles and tendons in her left ankle area which required operative procedures, had been caused by the exploding bottle.

With respect to the bottle "tipped" or "kicked" over by the other lady, plaintiff professed no knowledge, and the transcript reveals nothing, other than that it was "a green bottle."[3] When plaintiff's attention

---

2. On cross-examination plaintiff confirmed her prior depositional testimony that "actually the [other] lady kicked the bottle over."

3. In the statement of facts in plaintiff's-appellant's brief, counsel identify and describe this bottle as a "green *16 ounce* bottle," referring us to a specific page of

was called to this green bottle as it was kicked over and rolled toward her, she noticed two or three other "dark colored" bottles in the same area on the floor, but it was the green bottle that exploded and injured her. After her accident, she remembered that she had seen bottles on the floor while shopping in this IGA supermarket on other occasions prior to the date of her injury; but, since she usually purchased canned soft drinks displayed on the top shelf, she previously had paid no attention to bottles on the floor.

That the tedious winnowing and recordation of additional factual detail may be minimized, we now turn to the issue submitted by plaintiff in the trial court and to her theory on this appeal. In her second amended petition upon which she proceeded to trial, plaintiff charged specific negligence on the part of both defendants in twelve assignments and additionally on the part of defendant Coke in four more assignments. However, plaintiff's submission in her verdict-directing instruction 2 (characterized by her counsel as "MAI 31.-01, MAI 22.03, MAI 19.01, and MAI 7.01 modified") did not track any of the sixteen assignments of negligence in her second amended petition but directed a verdict for plaintiff upon findings that "First" defendant [Coke] built the soft drink department, "Second, *the soft drink department did not contain a shelf for the placement of individual bottles of soft drink* and was thereby dangerous to persons in the vicinity of its probable use while it was being used in the manner and for the purpose intended," "Third" defendant knew or by using ordinary care could have known of such dangerous condition,[4] "Fifth, *defend-*

*ant failed to use ordinary care to provide a shelf for the placement of individual bottles of soft drink*" and "Sixth" such failure caused or contributed to cause plaintiff's damage. (Except as otherwise stated, all emphasis herein is ours.)

■ Thus, plaintiff's submitted theory was that "the soft drink department *did not contain* [*or*, as stated in the "Fifth" hypothesis, *did not "provide"*] *a shelf* for the placement of individual bottles of soft drink."[5] Resolution of the instant appeal rests upon the submissibility of that single issue, for it has long been settled that an appellate court will review a case only upon the same theory upon which it was submitted in the court nisi [Welch v. McNeely, 269 S.W.2d 871, 875(2) (Mo. 1954), and cases there cited; Hansmann v. Rupkey, 428 S.W.2d 952(1) (Mo.App. 1968); Griffin v. Anderson, 369 S.W.2d 889, 892(7) (Mo.App.1963)]; and, if no case was made on plaintiff's single submitted issue, the trial court erred in not directing a verdict in accordance with defendant Coke's motion therefor at the close of the evidence [Blankenship v. St. Joseph Fuel Oil & Mfg. Co., 360 Mo. 1171, 1180, 232 S.W.2d 954, 960(12) (1950), and cases there cited; Hampton v. Loper, 402 S.W. 2d 825, 828(3) (Mo.App.1966)] and appropriately rectified that error by sustention of Coke's timely after-trial motion and entry of judgment for that defendant.

On this appeal, plaintiff's position, as recorded in the "Points Relied On" in her brief, is that: "The trial court incorrectly set aside the jury's verdict for plaintiff and entered judgment for defendant in accordance with its motion for directed ver-

---

the transcript as required by Rule 84.04 (h), V.A.M.R. However, we find no statement concerning the size of that bottle either on the cited page or elsewhere in the transcript.

4. There was no "Fourth" paragraph in this instruction, as found in the transcript.

5. This submitted theory would seem to be akin to, but narrower and more restricted than, assignments (c) and (d) of the twelve pleaded assignments against both defendants, which charged negligence "(c) in failing to have *sufficient suitable shelves* abailable (sic) for placing single bottles of soft drinks" and "(d) in failing to design, build, install, furnish and maintain *sufficient suitable shelves* for holding single bottles of soft drinks."

dict at the close of plaintiff's evidence, because: A. Coke had a duty, as the manufacturer and owner of the soft drink display, to construct and supply a soft drink display safe for the use for which it was intended. B. Coke breached its duty to use reasonable care by designing, building and supplying a soft drink display with a *latent defect.* C. The breach, by Coke, of its duty to use reasonable care to supply a reasonably safe soft drink display was the proximate cause of plaintiff's injury." Some of the authorities cited under the foregoing points and the excerpts quoted therefrom, to which we now attend, shed further light on plaintiff's position.

Under *Point A,* plaintiff's counsel cite Restatement of Torts 2d §§ 392, 395, 398; LaGorga v. Kroger Company, 275 F.Supp. 373 (W.D.Pa.1967); and Stevens v. Durbin-Durco, Inc., 377 S.W.2d 343 (Mo. 1964). After quoting segments of Section 392 of the Restatement supra, pertaining to the potential liability of a supplier of a "Chattel Dangerous for Intended Use" and Section 395, pertaining to the potential liability of a manufacturer for "Negligent Manufacture of Chattel Dangerous Unless Carefully Made," counsel quote a portion of Section 398 dealing with the potential liability of a manufacturer of a "Chattel Made Under Dangerous Plan or Design," which they characterize as being "a special application [of Section 395] meaningful to our case," said Section 398 in its entirety being as follows: "A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use *for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design."* (Italicized language omitted in brief.)

Proceeding to Stevens v. Durbin-Durco, Inc., supra, in which the injured plaintiff, who sought to recover from the defendant manufacturer on the theory of the latter's alleged negligence in the design of a "load binder" not equipped with a safety ratchet to prevent a kick-back, was denied recovery as a matter of law, instant plaintiff's counsel quote the following paragraph from the opinion in that case [377 S.W.2d at 346], however significantly omitting therefrom the meaningful citations here enclosed in brackets: "The manufacturer of a product which is potentially dangerous when applied to its intended use [Tayer v. York Ice Machinery Corp., 342 Mo. 912, 119 S.W.2d 240] or reasonably certain to place life and limb in peril when negligently made [Zesch v. Abrasive Co. of Philadelphia, 353 Mo. 558, 183 S.W.2d 140, 145, 156 A.L.R. 469; McLeod v. Linde Air Products Co., supra (318 Mo. 397, 1 S.W. 2d 122); Jacobs v. Frank Adams Electric Co., Mo.App., 97 S.W.2d 849; Restatement, Law of Torts, § 395] is under a duty to a remote user to exercise ordinary care in its manufacture, and is liable to a remote user injured thereby if the injury results from a *latent defect* bespeaking lack of ordinary care in making the product. [Zesch v. Abrasive Co. of Philadelphia, supra (abrasive cutting-off wheel exploded); McLeod v. Linde Air Products Co., supra (clogged valve in an oxygen tank); McCormick v. Lowe & Campbell Athletic Goods Co., 235 Mo.App. 612, 144 S.W.2d 866 (bamboo vaulting pole broke); Jacobs v. Frank Adams Electric Co., supra (electric panel board exploded).]" (Emphasis by plaintiff's counsel.)

As we have seen, plaintiff's charge in *Point B* is that "Coke breached its duty to use reasonable care by designing, building and supplying a soft drink display with a *latent defect"*; and, in the *argument* under this point, we are told what allegedly constituted this *latent defect,* to wit, "Coke did not design or build a soft drink department containing any provision for the placement of unwanted single bottles and by reason thereof, the soft drink department contained a *latent defect."* Plaintiff's case in the trial court was developed, and on appeal is presented, along the line that no shelf in the display unit was suitable for

unwanted single bottles removed by customers from the cartons of small bottles with which all of the shelves, other than the top one, were stocked, but the primary thrust of her counsel has been and is directed against the "spring-away" shelves. In pursuing this avenue of attack in the trial court, on both direct and redirect examination of Coke's home market manager Jones, who was called by plaintiff and was in no sense of the term a hostile witness, plaintiff's counsel elicited frank statements that the "spring-away" shelves were not *"designed"* for single bottles. In both the original and reply briefs here filed by plaintiff, we find those statements cited as the basis for, and strangely transmogrified in, assertions by counsel that witness Jones testified "spring-away" shelves "were not *suitable"* for single bottles. In the situation under consideration, "design" and "suitability" are not synonymous; and, when the testimony of witness Jones, in no wise self-contradictory, is properly read and considered as an integrated whole [Dimond v. Terminal R. R. Ass'n of St. Louis, 346 Mo. 333, 353, 141 S.W.2d 789, 799(12) (1940); Superior Loan Corp. of Buffalo v. Robie, 476 S.W.2d 144, 148(2) (Mo.App. 1972); Garrard v. State Dept. of Public Health & Welfare, 375 S.W.2d 582, 592(25) (Mo.App.1964)], it may not fairly be said to support plaintiff's contention that the "spring-away" shelves "were not *suitable"* for single bottles. In so concluding, we have not overlooked the testimony of witness Jones and plaintiff's witness Richey, a "stocker and checker" in this IGA supermarket, that when either of them picked up a single bottle from the floor or (as Richey occasionally did) returned a single bottle left by a customer at the check-out counter, he always placed any such individual bottle in a carton and never set it on a shelf. However, as the record clearly shows, neither Jones nor Richey followed that precautionary practice because the "spring-away" shelves were "not suitable" for single bottles, but rather in recognition of the obvious and inescapable truth (specifically pointed out by Jones) that "a single bottle is easier to turn over . . . on any type of shelf."

As hereinbefore noted, single small bottles were dispensed from a cooler just inside the entrance to this supermarket but in keeping with modern supermarket merchandising policies only cartons of uncooled small bottles were stocked and displayed in the soft drink department. Hence, no portion of the display unit was "designed" for that use. However, it does not necessarily follow that such unit would not safely accommodate or hold individual small bottles. Rather, both testimonial [6] and photographic [7] evidence received during the presentation of plaintiff's case (and defendant then rested without offering additional evidence) affirmatively showed that a "spring-away" shelf would safely accommodate or hold single small bottles, and there was no evidence to the contrary.

Furthermore, both the bottom and top shelves in this display unit were solid and immovable plywood shelves, and there is no room for argument about the fact that they were suitable for, and would safely accommodate and hold, single small bottles.

6. This was the plain and unmistakable import (a) of witness Jones' testimony as repeatedly manifested at six widely-separated points in the record of his extended examination covering 123 pages of the transcript, and (b) likewise of the testimony of witness Richey, the IGA "stocker and checker," who readily agreed that the "spring-away" shelves "will hold single bottles without any problems."

7. Among the exhibits received in evidence were four photographs, each of which showed a *single small bottle* as the only object on a "spring-away" shelf lowered to a horizontal position in this IGA soft drink department. In one of those photographs, the single small bottle was standing upright on the front or outer end of the shelf, in another the bottle was standing upright midway between the front and rear ends of the shelf, in another the bottle was standing upright on the rear end of the shelf, and in another the bottle was lying on its side, crosswise of and on the front or outer end of the shelf.

Clear recognition of that fact by plaintiff's counsel is manifested by the statement in their brief that "she [plaintiff] does not contend Coke was required to . . . construct an additional structure, but that Coke should merely have provided for unwanted and discarded single bottles," *which "could have easily been accomplished by reserving portions of the top shelf for this purpose* rather than disregarding safety for maximum display area."

We have pointed out in other cases, and here reiterate, that "[i]t is a well-known fact of present-day business life that customers in self-service stores indubitably have and freely exercise the practically unrestricted privilege of moving, picking up, handling, examining and relocating items displayed for sale [Hart v. Emery, Bird, Thayer Dry Goods Co., 233 Mo.App. 312, 317, 118 S.W.2d 509, 512; Cohen v. Penn Fruit Co., 192 Pa.Super. 244, 159 A.2d 558, 560(4)]." Copher v. Barbee, 361 S.W.2d 137, 143 (Mo.App.1962). See also Abernathy v. Coca-Cola Bottling Co. of Jackson, 370 S.W.2d 175, 178 (Mo.App.1963). And others, commenting concerning the propensity of customers in self-service markets to handle bottles of soft drinks and "sometimes" leave them on the floor, likewise have recognized that "[i]t would be virtually impossible to prevent this in any self-service market." Beuttenmuller v. Vess Bottling Co. of St. Louis, 447 S.W.2d 519, 528 (Mo.1969). The record in the instant case convincingly confirms the accuracy and demonstrates the applicability of the foregoing judicial pronouncements, for plaintiff's witness Richey, the IGA "stocker and checker" who swept and mopped after closing hours, not only came upon individual bottles on the floor in front of the soft drink department some "half to three-quarters" of the time but also found other products on the floor "in other departments . . . all over the store" just as frequently. As for broken bottles, Richey said "you get something usually, in the store broken every day, not necessarily pop," e. g., "pickle jars and other things that break."

■ We conclude this portion of our discussion with the comments (1) that after an extended study of the transcript and briefs in this case we are satisfied that plaintiff's case was neither pleaded nor submitted in the trial court, and is neither briefed nor presented in this court, on a failure to "reserve" theory, (2) that, in any event, an attempt to inhibit and forfend the placing of single bottles on the floor by reserving portions of a shelf in a supermarket soft drink department would, from a practical standpoint, be utterly inutile and wholly ineffectual, and (3) that there was a fatal failure of factual proof on the sole submitted theory in plaintiff's verdict-directing instruction 2, i. e., that "the soft drink department did not contain [or did not "provide"] a shelf for the placement of individual bottles of soft drink."

In our comprehensive consideration of the case, we also have noted the want of any evidence which would have permitted a finding (a) as to whether the "green bottle" on the floor was a Coke product, (b) as to whether that bottle, when "tipped" or "kicked" over and then righted by another, was in front of that section of the soft drink department retained by Coke for the stocking and displaying of its products or was in front of some other section of the soft drink department in which the products of one of the other five bottlers displaying their products in that department were stocked,[8] (c) as to the length of time

8. If an inference concerning this matter were permissible (which we need not determine), it would place the "green bottle" in front of the Pepsi section, since plaintiff intended to pick up some canned Pepsi and her narrative account of "what happened" when she "got down to the pop display" indicates that the unidentified lady who "tipped" or "kicked" over the "green bottle" was then standing at such point that plaintiff could not conveniently reach the canned Pepsi, so she (plaintiff) "stayed back of a (sic) her, a little to the right" until the other lady "walked on," after which plaintiff picked up her Pepsi, "turned around," and was struck by pieces of the exploding bottle.

the "green bottle" had been on the floor prior to the accident (that being relevant to the matter of IGA's intervening negligence vel non), and (d) as to whether or not, either when the "green bottle" was set on the floor or thereafter, there was available and adequate space for individual bottles to have been set on the top or bottom plywood shelf in the adjacent section of the display unit. Our settled conclusions on other issues in the case render it unnecessary for us to explore the labyrinthine maze of proximate cause, but in passing we record our grave doubt that instant plaintiff made a submissible case on that essential element. See Busch v. Great Atlantic & Pacific Tea Co., 416 S.W.2d 247, 251(6) (Mo.App.1967).

■■ Still another reason, wholly aside from those hereinbefore discussed, precludes plaintiff's success on this appeal. For, even if (contrary to our stated opinion) the display unit, hereinbefore described in detail, might be said to have been designed with some "defect" (by us neither perceived nor perceptible), plaintiff's firm position that there was "a *latent* defect" cannot be honored. "[N]o defect can be considered latent which is discoverable by the exercise of due care" [Forbis v. Hessing, 328 Mo. 699, 704, 41 S.W.2d 378, 380(1) (1931)] or "reasonable diligence." O'Gorman v. Kansas City, 233

Mo.App. 124, 134, 93 S.W.2d 1132, 1137(3) (1936). The character of defect, which properly may be found to be latent, is exemplified by the cases thus cited in Stevens v. Durbin-Durco, Inc., supra, 377 S.W.2d at 346, namely, "Zesch v. Abrasive Co. of Philadelphia, supra [353 Mo. 558, 183 S.W.2d 140, 156 A.L.R. 469] (*abrasive cutting-off wheel exploded*); McLeod v. Linde Air Products Co., supra [318 Mo. 397, 1 S.W.2d 122] (*clogged valve in an oxygen tank*); McCormick v. Lowe & Campbell Athletic Goods Co., 235 Mo.App. 612, 144 S.W.2d 866 (*bamboo vaulting pole broke*); Jacobs v. Frank Adams Electric Co., supra [Mo.App., 97 S.W.2d 849] (*electric panel board exploded*)." Any "defect" in design of the display unit, such as that professedly detected by plaintiff's counsel, would have been far removed from the category of those in the cited cases and, as we are convinced, necessarily would have been discoverable by instant plaintiff in the exercise of "due care" or "reasonable diligence."

The judgment of the circuit court is affirmed.

TITUS, C. J., and HOGAN, J., concurs.

BILLINGS, J., not participating because not a member of the court when this cause was submitted.